**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DEWANNA D. MCKINLEY**                                    **CIVIL ACTION**

**VERSUS**                                                             **NO. 25-670**

**SCI SHARED RESOURCES, LLC;**                            **SECTION "B" (4)**
**SCI SHARED SERVICES, INC..; AND**
**S.E. CEMETERIES OF LOUISIANA**

**ORDER AND REASONS**

Before the Court are defendants' Motion to Dismiss (Rec. Doc. 15), plaintiff's opposition (Rec. Doc. 32), and defendants' reply (Rec. Doc. 40). Also before the Court is defendants' Motion to Strike (Rec. Doc. 39), For the following reasons,

**IT IS ORDERED** that defendants' Motion to Strike (Rec. Doc. 39) be **DENIED**. Defendants may reurge the motion following plaintiff's submission of the information concerning the October 2024 supplemental letter submitted to the EEOC;

**IT IS ORDERED** that the defendants' motion to dismiss (Rec. Doc. 15) be **GRANTED in part and DENIED in part** as follows**:**

Defendants' motion to dismiss plaintiff's Section 1981 disparate treatment claim is **DENIED**;

Defendants' motion to dismiss the following claims is **GRANTED**: plaintiff's Section 1981 retaliation and disparate impact claims and Title VII retaliation claim are **DISMISSED WITH PREJUDICE;**

Defendants' motion to dismiss the following claims is **GRANTED**: plaintiff's Section 1981 hostile work environment claim and Title VII hostile work environment, disparate impact, and disparate treatment claims are **DISMISSED WITHOUT PREJUDICE**, subject to

1

reconsideration pursuant to plaintiff's submission, **no later than April 15, 2026**, of both a motion for leave to amend complaint to address the deficiencies noted herein and affidavit addressing the deficiencies noted herein concerning the October 2024 supplemental letter.

## I.    FACTUAL BACKGROUND

Mount Olivet Cemetery, located in New Orleans' Mid-City District, was established in 1918 and primarily serves the African American and Creole communities in the surrounding areas. Rec. Doc. 5 at 7. In 2013, Mount Olivet was acquired by SCI Holdings, through its subsidiaries SCI Funeral Services and S.E. Cemeteries of Louisiana (collectively, "**SCI**"). *Id*. at 6. SCI also owns and manages other funeral homes and cemeteries, including (1) Lake Lawn Metairie Funeral Home & Cemeteries, (2) St. Bernard Memorial Funeral Home & Gardens, (3) St. Vincent de Paul Cemeteries, (4) Leitz-Eagan Funeral Home, (5) Westside/Leitz-Eagan Funeral Home, and (6) Grace Funeral Home & St. Lazarus of Bethany Memorial Garden. *Id*. at 14.

Dewanna McKinley, an African American woman, began working at Mount Olivet in 2010 as a Community Service Counselor and, due to "consistent exemplary sales performance," was promoted to Sales Manager for Mount Olivet on November 29, 2014, serving in that role until her November 2023 termination. Rec. Doc. 5 at 14. As Sales Manager for Mount Olivet, McKinley led a sales team that assisted customers with purchasing funeral and burial services. McKinley's sales team consisted of African American employees only. *Id*. at 14. McKinley asserts that, aside from the members of her sales team, no other African American served as a Sales Manager or member of a sales team at any other SCI-owned cemetery or funeral home. *Id*. at 15.

Sales associates at SCI-owned cemeteries and funeral homes received compensation from either, or a combination of, a base salary, bonuses, or commissions. Rec. Doc. 5 at 11. These sales associates provided either pre-need or at-need services. Pre-need services refer to the planning and paying for funeral and related services and products before a death occurs while at-need services

refer to funeral and related services that are arranged after a death occurs. *Id*. at 11–12. A sales associate would receive a 9% commission for the sale of pre-need services or products but only a 4% commission for the sale of at-need services or products. *Id*. at 13. McKinley could provide pre-need and at-need services, and her compensation was a combination of a base salary, bonuses, and any commission she earned from the sale of funeral, burial, or related services and products. *Id*. at 14–15.

Before October 2020, McKinley and her sales team would travel to other SCI-owned cemeteries and funeral homes to sell at-need products and services, including at Lake Lawn Metairie Funeral Home & Cemeteries ("**Lake Lawn**"), which McKinley states serves a predominately Caucasian clientele. Rec. Doc. 5 at 15–16. From these sales, McKinley and her team would receive the full 4% commission from the sale of an at-need service or product. However, the Sales Manager at Lake Lawn complained to SCI management about McKinley and her team providing at-need services at Lake Lawn. *Id*.

Following the Lake Lawn Sales Manager's complaint, on October 26, 2020, Jonathan Laskie, the Market Sales Director for SCI, introduced a new Lead Protection Policy that informs sales associates about how associates may earn commissions from the sale of a product or service to a lead. Rec. Doc. 1 at 16. In this context, a "lead" refers to a potential customer. *Id*. at 13. The policy provides that an associate can "protect," or ensure they receive the commission for, a lead only if they include relevant information about the lead into Salesforce, an online platform that SCI relies on to track information about potential sales. *Id*. at 16. The policy also explains that Preplanning Advisors ("PPA") will receive 100% of the commission of the sale of a cremation property if the placement takes place after 30 days of first contact and 50% of the commission if the placement takes place within 30 days (the other 50% to be provided to the sales associate

handling primarily at-need services like cremation). *Id*. at 16–17. The Policy was amended in the following months and years, effectively changing the relevant split to 70% in favor of a PPA. McKinley alleges that the policy effectively allows PPAs—all but one of whom are non-Black—to take the commission that otherwise would go to McKinley and her all-Black sales team who primarily sell at-need products like burial plots and cremation niches. *Id*. at 18. Meanwhile, PPAs allegedly "are allowed to make sales for any location for Pre-Need Services." *Id*. at 17. Mckinley argues that the policy "intentionally and purposefully" targeted her team. *Id*. at 18.

On September 26, 2022, a married couple walked into the Mount Olivet Cemetery office to inquire about purchasing pre-need services for a burial plot. Rec. Doc. 5 at 21.  This couple had previously visited Lake Lawn but determined that they could not afford the products on offer there. *Id*. at 22. McKinley, and the sales associate assisting the couple, searched Salesforce to see if either person had been added as a lead. *Id*. Finding that the couple's personal information was not in Salesforce, McKinley directed the sales associate to proceed with providing the couple a pre-need sales presentation; the following morning, the associate completed the sale. *Id*.

Two days later, on September 29, 2022, Laskie texted McKinley to inform her that the sale to the married couple was to be given to a PPA because he had directly provided that person with the couple's information; the couple and the PPA had scheduled to meet at Lake Lawn; and that all of these details were added to Salesforce. Rec. Doc. 5 at 23. McKinley alleges that Laskie became irate and began berating her, speaking to her in a condescending tone, and accusing her of ignoring the Lead Protection Policy. *Id*. Though McKinley and her sales associate informed Laskie, during a phone call, that no information pertaining to the couple existed in Salesforce, McKinley alleges that Laskie stated he would credit the sale to the PPA regardless of that fact. *Id*. According to McKinley, Laskie threatened to write-up both McKinley and her sales associate

4

because of their raised voices and for cursing at him. *Id*. at 24. McKinley states that, shocked by Laskie's actions and "obvious bias," on September 29, 2022, she emailed SCI management to report him. *Id*. McKinley asserts that, in response, Laskie ordered that McKinley be subjected to a "lateral transfer," i.e., that McKinley would report directly to Laskie. *Id*. The order became effective on October 8, 2022, despite McKinley's emails to SCI management and human resources personnel about possible retaliation. *Id*. Following the transfer, Laskie allegedly began issuing "pretextual counseling or discipline for various alleged poor performance or for not following his directives." *Id*. at 27.

According to McKinley, the lateral transfer was the start of Laskie's and other supervisors' discriminatory actions. In March 2023, Mount Olivet began preparing for "Phase 8," an expansion project that included additional burial crypts. Rec. Doc. 5 at 28. On March 22, 2023, McKinley requested a seminar for Mount Olivet to promote the Phase 8 expansion. *Id*. Laskie had initially agreed to conduct the seminar and provided McKinley with two options: (1) to conduct self-invite seminars in April 2023 or (2) to wait until May 2023 for company-sponsored 2500 Mail-Out seminar for the Mount Olivet location only. *Id*. McKinley accepted the second option and began to prepare accordingly. *Id*. However, on April 24, 2023, two weeks from the first of two planned company-sponsored seminars, Laskie informed McKinley that "[i]f it's a company mailed seminar it's really for PPA but you guys can do self-invites. You can do a self-invite Mt. Olivet only seminar there but we can't do a mailer for it." *Id*. at 29. McKinley asserts that Laskie had not informed her there was a change in plans or that the company-sponsored mailouts was only for the PPA team.

In response, on April 25, 2023, McKinley emailed SCI management to complain about the change, noting that PPAs involvement would lead to PPAs taking the leads—and therefore the

5

commissions—from the mail-outs sent to a predominantly African American and Creole clientele. Rec. Doc. 5 at 31. While PPAs could benefit from the company-sponsored mail-outs and other opportunities, McKinley asserts that she and her sales team were intentionally prevented from accessing high-value sales territories with white clientele while the "predominantly white" PPA team was not similarly restricted. Rec. Doc. 5 at 32.

The alleged discriminatory and retaliatory actions continued. In May 2023, Laskie, allegedly enraged about McKinley's high earnings after learning of her compensation plan in the months prior, directed SCI's Human Resources to change McKinley's plan to reduce her overall compensation. Rec. Doc. 5 at 38. Additionally, Laskie increased McKinley's sales team quota from $310,000 per month to $370,000 per month, which effectively made it more difficult for McKinley to meet sales quotas. *Id*. at 40. McKinley claims that no other Sales Manager, all of whom were white during her tenure, had their compensation plan reduced. *Id*. at 41.

McKinley's remaining months at Mount Olivet culminated in what she alleges were two final discriminatory actions. First, on August 25, 2023, Laskie directed another manager to hand McKinley a written warning for contacting, on the same day, a person that another sales associate had contacted. Rec. Doc. 5 at 41. McKinley argues that the basis for the written warning was pretextual and that Laskie "continued to harbor race-based and retaliatory animus" against her because of her prior EEO complaint and for reporting his conduct to various supervisory and human resources personnel. *Id*. Finally, on November 17, 2023, Laskie terminated McKinley because of the latter's decision to remove from Workday—an online personnel management platform—a member of her sales team who had resigned a week earlier. *Id*. at 42. Laskie did not want to accept the sales associate's resignation and wanted to see if there was another position he could offer her. *Id*. McKinley asserts that the Human Resources Manager gave McKinley the

option to remove the sales associate from Workday and that she exercised authority she was given. *Id*. at 42–43. McKinley argues that Laskie used her action as a pretext for firing her for reporting him to management and engaging in other protected activity. *Id*. at 44.

## II.    PROCEDURAL HISTORY

On June 6, 2024, McKinley filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") and the Louisiana Commission on Human Rights. Rec. Doc. 15-2. In her Charge, she alleged that: (1) in June 2023, SCI changed her compensation plan; (2) in June 2023, Laskie informed her that mail out leads would be given to a different sales team composed of only white associates; and (3) that in November 2023, she was suspended and subsequently discharged. *Id*. She stated her belief that she was discriminated against because of her race. *Id*. On January 7, 2025, the EEOC issued McKinley a Notice of Right to Sue in this matter for the allegations contained in her Charge. Rec. Doc. 5 at 73.

On April 7, 2025, McKinley filed a complaint against SCI in this Court, which she subsequently amended. Rec. Docs. 1, 5. In her Amended Complaint, McKinley asserts several claims against SCI, including: (1) hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1981; (2) disparate treatment in violation of Title VII and 42 U.S.C. 1981; (3) disparate impact in violation of Title VII and 42 U.S.C. 1981; and (4) retaliation in violation of Title VII and 42 U.S.C. 1981. *Id*. at 46–71. SCI has moved to dismiss the claims against it, arguing that McKinley failed to exhaust and timely file most of her claims and failed to state causes of action for which she could be afforded relief. Rec. Doc. 15. McKinley opposes SCI's motion to dismiss and has attached to her opposition a letter which she claims she submitted to the EEOC in October 2024—four months after she initially filed her Charge. Rec. Docs. 32, 32-1. SCI has moved to strike the supplemental letter and additional exhibits contained therein. Rec. Doc. 39. McKinley has not opposed the motion to strike. All motions are ripe for adjudication.

7

III.   **LAW AND ANALYSIS**

   **A. Legal Standard**

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8's pleading standard demands more than "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A defendant may file a Rule 12(b)(6) motion to dismiss if they contend that a plaintiff's complaint does not satisfy Rule 8's pleading standard. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is plausible when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the plaintiff is not entitled to relief. *Id*. at 679. A court must accept the complaint's factual allegations as true and draw "all reasonable inferences in the plaintiff's favor." *Lormand v. U.S. Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009).

In considering a 12(b)(6) motion, a court generally is limited to the face of the pleadings. *Xavier v. Belfor USA Grp., Inc*., No. CIV.A. 06-491, 2007 WL 4224320, at *1 (E.D. La. Nov. 26, 2007). However, a court is permitted to rely on documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lane Star Fund v (U.S.), L.P v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). A court may also consider matters of public record and those of which a Court may take judicial notice. *Xavier*, 2007 WL 4224320, at *1.

   **B. Analysis**

8

McKinley raises discrimination claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. While both statutes prohibit race-based discrimination in employment and are analyzed using the same substantive framework, they differ in their procedural requirements. *O'Neal v. Cargill, Inc.*, 178 F. Supp. 3d 408, 420 (E.D. La. 2016). Notably, Title VII requires exhaustion of administrative remedies; Section 1981 does not. *Id*. Title VII claims are subject to a 300-day statute of limitations; Section 1981 claims are not.[1] *Id*. The Court will address McKinley's Section 1981 claims before turning to whether she has exhausted and timely filed her Title VII claims.[2]

### 1. Hostile Work Environment under Section 1981

The Court begins with McKinley's hostile work environment claims under Section 1981. To establish a hostile work environment, a plaintiff must prove that (1) she belongs to a protected class; (2) she was subjected to unwelcome conduct; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999); *see also Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) (stating that the analysis of discrimination claims is the same under Section 1981 and Title VII).

In her Opposition to SCI's Motion to Dismiss, McKinley relies almost entirely on factual allegations she detailed in an October 2024 supplemental letter she sent to the EEOC but did not attach to her Amended Complaint. In her Opposition, McKinley claims that (1) her pay was less than white managers at other locations; (2) Laskie caused plaintiff and her team to feel devalued

---

[1] Section 1981 claims are, instead, subject to a four-year statute of limitations. *O'Neal v. Cargill, Inc.*, 178 F. Supp. 3d 408, 420 (E.D. La. 2016).
[2] SCI does not dispute the timeliness of McKinley's Section 1981 claims.

and openly ostracized by white colleagues; (3) Laskie instructed her not to speak to white counselors; (4) Laskie told her to "shut up and listen"; and (5) that McKinley feared Laskie. Rec. Doc. 32 at 12–13. These allegations do not appear in the Amended Complaint. Instead, the operative complaint focuses on (1) the October 2022 lateral transfer and receipt of written warnings; (2) an October 2022 comment from Laskie that members of McKinley's sales team could join the PPA team; (3) comments about McKinley's income; and (5) conclusory allegations that Laskie tolerated and directed other employees to engage in discriminatory conduct toward her. Rec. Doc. 5 at 47–54. After review of the Amended Complaint, the Court concludes that McKinley has not shown that the hostile work environment was based on her race. Her hostile work environment claims are therefore **DISMISSED**. Because Section 1981 and Title VII hostile work environment claims are analyzed using the same substantive framework, this necessarily requires that McKinley's Title VII hostile work environment claims also be **DISMISSED**. However, because the allegations in the Opposition possibly supports a hostile work environment claim based on race, the Court will allow McKinley leave to file a motion to amend her complaint. SCI may oppose any motion for leave to amend.

### 2. Disparate Impact and Disparate Treatment under Section 1981

The Court turns to McKinley's disparate impact and disparate treatment claims. A disparate impact claim is not legally cognizable under Section 1981. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 388–89 (1982). That claim is therefore **DISMISSED WITH PREJUDICE**. As for the disparate treatment claim, SCI concedes that "[McKinley] can proceed under Section 1981 for intentional discrimination claims." Rec. Doc. 40 at 5. For a disparate treatment claim, there are two ultimate elements that must be pleaded: (1) an adverse employment action that is (2) taken against an employee because of a protected status. *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019). Though a close call, the Court concludes

10

that McKinley has adequately pled a disparate treatment claim. She has alleged specific instances of possibly adverse actions that occurred because of her race including, for example, being prevented from selling burial and funeral products in high-earning client locations, having her income reduced while white Sales Managers' income remained the same, and denial of salary increases and promotional opportunities. Rec. Doc. 5 at 54–56. SCI's Motion to Dismiss McKinley's Section 1981 disparate treatment claim is **DENIED**.

### 3. Retaliation under Section 1981

Finally, the Court reviews McKinley's retaliation claims. To state a claim for retaliation, a plaintiff must show: (1) she participated in some statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Mota v. The Univ. of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). A plaintiff engages in protected activity if she opposes a practice deemed an unlawful employment practice by Title VII (the "opposition clause") or makes a charge, testifies, assists, or participates in any manner in an investigation, proceeding, or hearing under Title VII (the "participation clause"). *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016); *see also Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (applying the Title VII retaliation framework to a claim of retaliation under Section 1981). Courts have found that "lodging an internal complaint that explicitly alleges discrimination or harassment based on a protected characteristic…qualifies as a protected activity" while "an internal complaint that does not allege discrimination or any other unlawful activity…is not considered protected activity." *Rodriguez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328–29 (5th Cir. 2013).

In the operative complaint, McKinley alleges that she "engaged in protected activity when she refused to make false statements about a subordinate and instead reported discriminatory conduct" in emails to SCI management about Laskie's behavior during the September 26, 2022

11

incident. Rec. Doc. 5 at 65. However, these emails do not demonstrate that McKinley complained about discriminatory conduct. Even if Exhibit 1 to McKinley's Opposition is admissible, the attached emails contained therein do not convince the Court that McKinley engaged in protected activity. In McKinley's September 30, 2022 email to SCI management, she certainly complained about Laskie's behavior during the September 26, 2022 incident, but at no point does she claim that he was discriminatory or engaged in any other unlawful behavior. Rec. Doc. 32-1 at 10–11. Nor do McKinley's October 2022 emails, cited in her Amended Complaint, suggest a different result. In those emails, McKinley complains about the lateral transfer and states that it would place her in an uncomfortable position. Rec. Doc. 5 at 25–27. But there is no complaint about any discriminatory action or harassment.

McKinley also cites as protected activity her opposition to and reporting of "race-based exclusion of her Sales Team from high-value territories and resources, including the seminars and mail-out leads" and internal complaints, dated April 25, 2023 and May 2, 2023, about discriminatory practices involving the PPA team. Rec. Doc. 5 at 65–66; Rec. Doc. 32 at 30. However, aside from the conclusory allegations, McKinley has not shown that she engaged in protected activities. Her April 25, 2023 email, included in her complaint, shows that she complained about the PPA team benefitting from the seminar she planned and that the PPA team would be taking money from her sales associates as a result. Rec. Doc. 5 at 30–31. However, though she complained about the PPA team benefiting from Laskie's actions, she did not complain about race discrimination or other unlawful activity, and therefore did not engage in any protected activity. *See Moore v. United Parcel Serv., Inc.*, 150 F. App'x 315, 319 (5th Cir. 2005) (finding that plaintiff "was not engaged in protected activity, as his [complaint] did not oppose or protest racial discrimination or any other unlawful employment practice[.]").

Because McKinley has not shown that she engaged in any protected activities, her Section 1981 retaliation claims are **DISMISSED WITH PREJUDICE**. Because Section 1981 and Title VII retaliation claims are analyzed using the same substantive framework, McKinley's Title VII retaliation claims are likewise **DISMISSED WITH PREJUDICE**.

### 4. *The Remaining Title VII Claims*

Given that Section 1981 and Title VII are analyzed using the same substantive framework, the Court has, based on the foregoing analysis, dismissed under both statutes McKinley's retaliation and hostile work environment claims—though the latter claims are subject to reconsideration upon McKinley's timely submission of a motion for leave to file amended complaint addressing the deficiencies noted herein. McKinley's remaining claims are for disparate treatment and disparate impact under Title VII.  But before the Court can assess the plausibility of McKinley's claims, it must assess whether she has satisfied Title VII's exhaustion requirement and will do so with respect to her disparate treatment, disparate impact, and hostile work environment.[3]

Title VII requires employees to exhaust their administrative remedies before seeking judicial relief. *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). To properly exhaust, a plaintiff must file a charge with the EEOC before bringing their claim to federal court. *Grice v. FMC Techs. Inc.*, 216 F.App'x 401, 405 (5th Cir. 2007). The scope of a complaint must be "limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 395 (5th Cir. 2000). Allegations in a complaint "may encompass any kind of discrimination like or related

---

[3] Though the Court has dismissed without prejudice all of McKinley's hostile work environment claims for not stating a claim for which relief can be granted, the Court will nevertheless address whether the Title VII hostile work environment claim has been exhausted because SCI raises the argument in its motion to dismiss.

to allegations contained in the charge and growing out of such allegation during the pendency of the case before the [EEOC]." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). Because "the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally." *Pacheco v. Mineta*, 448 F.3d 783, 788–89 (5th Cir. 2006). However, a plaintiff's "ability to expand the scope of the EEOC charges in a complaint" is not unlimited. *Ghahramani v. BASF Corp.*, 755 F. Supp. 708, 711 (M.D. La. 1991) (citing *Young v. City of Houston*, 906 F.2d 177, 179 (5th Cir. 1990)).

The Court concerns itself with McKinley's disparate treatment, disparate impact, and hostile work environment claims under Title VII. In support of her disparate treatment claim, she alleges that (1) she was excluded from high-earning client locations; (2) she was subjected to hostile behavior, including disparaging remarks about her compensation; (3) she was denied promotional opportunities; (4) she was reassigned via a lateral transfer; (5) she denied access to at-need service opportunities; (6) she was targeted with fabricated write-ups; and (7) she was retaliated against through adverse assignments and discipline for opposing discrimination. Rec. Doc. 5 at 55–56. In support of her disparate impact claim, McKinley alleges that the June 2020 Lead Protection Policy, and its subsequent amendments, had disproportionate adverse effects on McKinley and all-Black her sales team—despite being facially neutral. *Id*. at 56–59. Finally, McKinley alleges that she was subjected to a hostile work environment for various reasons, which consisted of disciplinary lateral transfers, disciplinary writeups, disparaging and hostile comments, and discriminatory and hostile behavior from other employees. Id. at 46–54. These allegations do not appear in McKinley's June 2024 Charge, in which she alleges only (1) that her compensation plan was changed, (2) that in June 2023, Laskie informed her that mail-out leads would be given

to another sales team, and (3) that she was suspended and discharged—all because of her race. Rec. Doc. 15-1 at 1.

McKinley argues that her charge "expressly alleged that she was subjected to race discrimination, retaliation, and a hostile work environment during her employment with SCI." Rec. Doc. 32 at 6. But it does not. Instead, McKinley's argument is nearly exclusively supported by Exhibit 1, attached to her Amended Complaint, which includes an October 2024 supplemental letter she allegedly sent to the EEOC. *Id* (citing Rec. Doc. 32-1 at 2–8). While the Court is allowed to consider documents submitted to the EEOC during its investigation into an employee's charge without converting the instant 12(b)(6) motion into a summary judgment motion, *see Bracken v. Welborn*, No. CV 20-72-SDD-EWD, 2021 WL 237693, at *9 (M.D. La. Jan. 25, 2021), questions remain that prevent the Court from doing so. Questions remain on whether the EEOC received the October 2024 letter, whether that agency investigated the claims contained therein as part of its investigation into McKinley's Charge, and whether the Right to Sue letter the EEOC provided encompasses the later-submitted claims. We cannot simply rely on her Exhibit 1 to determine whether the hostile work environment, disparate treatment, and disparate impact claims have been exhausted. *See Bracken*, 2021 WL 237693, at *9 (stating that "the Court will not consider any evidence submitted that was not clearly part of the EEOC investigation file."). As such, McKinley's Title VII hostile work environment, disparate treatment, and disparate impact claims are **DISMISSED WITHOUT PREJUDICE** subject to timely reconsideration upon McKinley's filing of documentation addressing questions noted herein. SCI's Motion to Strike, Rec. Doc. 39, is **DENIED WITHOUT PREJUDICE**. SCI will be allowed

to reurge its motion to strike upon McKinley's submission of an affidavit or other document addressing the earlier discussed questions. The record shows that the EEOC investigator assigned to McKinley's case stated that her EEOC charge had not been amended. See Rec. Doc. 39-3. Absent evidence that the EEOC's investigative file contains reference to Title VII hostile work environment, disparate treatment, and disparate impact claims, those claims would be subject to dismissal with prejudice.

New Orleans, Louisiana, this 26th day of March 2026

_____

SENIOR UNITED STATES DISTRICT JUDGE