UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DEWANNA D. MCKINLEY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 25-670** |
| **SCI SHARED RESOURCES, LLC; SCI SHARED SERVICES, INC..; AND S.E. CEMETERIES OF LOUISIANA** | **SECTION "B" (4)** |

## ORDER AND REASONS

Before the Court is Defendant's Motion for Summary Judgment (Rec. Doc. 48) and Defendant's Motion to Dismiss for Failure to Prosecute (Rec. Doc. 51). Considering Defendant's Motions and Plaintiff's failure to comply with Court orders, discovery deadlines, and participate in this litigation,

**IT IS ORDERED** that the Motion to Dismiss for Failure to Prosecute (Rec. Doc. 51) be **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. 48) be **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## I. FACTUAL BACKGROUND

Mount Olivet Cemetery, located in New Orleans' Mid-City District was acquired in 2013 by SCI Holdings through its subsidiaries, SCI Funeral Services and S.E. Cemeteries of Louisiana (collectively, "SCI"). (Rec. Doc. 5 at 6.) SCI also owns and operates several other funeral homes and cemeteries, including Lake Lawn Metairie Funeral Home & Cemeteries, St. Bernard Memorial Funeral Home & Gardens, St. Vincent de Paul Cemeteries, Leitz-Eagan Funeral Home, Westside/Leitz-Eagan Funeral Home, and Grace Funeral Home & St. Lazarus of Bethany Memorial Garden. (Rec. Doc. 5 at 14.)

McKinley, an African American woman, began working at Mount Olivet in 2010 as a Community Service Counselor. After what she describes as, consistent exemplary sales performance, she was promoted to Sales Manager on November 29, 2014, and remained in that position until her termination in November 2023. (Rec. Doc. 5 at 14.) As Sales Manager, McKinley supervised a sales team that assisted customers with purchasing funeral and burial services. SCI's sales associates were compensated through some combination of salary, bonuses, and commissions. (Rec. Doc. 5 at 11.) Associates handled both pre-need and at-need sales. Pre-need services involve arrangements made before a death, while at-need services involve arrangements made after a death. (Rec. Doc. 5 at 11–12.) Associates received a 9% commission on pre-need sales and a 4% commission on at-need sales. (Rec. Doc. 5 at 13.) McKinley handled both types of sales and was compensated through a combination of salary, bonuses, and commissions. (Rec. Doc. 5 at 14–15.)

Before October 2020, McKinley and her team traveled to other SCI locations to make at-need sales, including at Lake Lawn Metairie Funeral Home & Cemeteries ("Lake Lawn"), which McKinley alleges served a predominantly Caucasian clientele. (Rec. Doc. 5 at 15–16.) Her team received the full 4% commission on those sales.

On October 26, 2020, SCI Market Sales Director Jonathan Laskie introduced the Lead Protection Policy, which governed how sales associates could establish their entitlement to commissions from potential customers, or "leads". (Rec. Docs. 1 at 13, 16 & 4 at 14.) Under the Policy, an associate could "protect" a lead by entering relevant information into Salesforce, SCI's platform for tracking potential sales. (Id.) The Policy also established rules governing the division of commissions between Preplanning Advisors ("PPAs") and sales associates handling primarily

at-need services. (Rec. Doc. 1 at 16–17.) The Policy was subsequently amended, changing the applicable commission split to favor PPAs. (Rec. Doc. 1 at 18.)

McKinley alleges that the Policy disproportionately affected her team because PPAs, nearly all of whom she alleges were non-Black, could receive commissions from sales that otherwise would have been made by her predominantly at-need sales team. (Rec. Doc. 1 at 17–18.) She further alleges that PPAs were permitted to make pre-need sales at any SCI location, while her team faced greater restrictions on where it could make sales. (Rec. Doc. 1 at 17–18.)

The dispute over the Policy became more immediate in September 2022. On September 26, a married couple visited the Mount Olivet office to inquire about purchasing a burial plot. (Rec. Doc. 5 at 21–22.) The couple had previously visited Lake Lawn but could not afford the products offered there (Id.). McKinley and another sales associate searched Salesforce and found no information indicating that either person had been entered as a lead. McKinley therefore directed the associate to proceed with a pre-need sales presentation, and the associate completed the sale the following morning. (Rec. Doc. 5 at 22.)

On September 29, Laskie informed McKinley that the sale should instead be credited to a PPA because Laskie had previously provided the PPA with the couple's information and had arranged for the couple to meet with the PPA at Lake Lawn. (Rec. Doc. 5 at 23.) Laskie also stated that the information had been entered into Salesforce. McKinley disputed that information and told Laskie that no information concerning the couple had appeared in Salesforce when she and the other sales associate searched for it. (Rec. Doc. 5 at 23.) McKinley alleges that Laskie nevertheless insisted that the sale would be credited to the PPA and threatened disciplinary action against McKinley and the sales associate. (Rec. Doc. 5 at 23–24.)

McKinley subsequently reported Laskie to SCI management, alleging that his conduct was biased. (Rec. Doc. 5 at 24.) She alleges that Laskie responded by ordering that she be transferred to report directly to him. The transfer became effective on October 8, 2022, despite McKinley's communications with SCI management and human resources regarding possible retaliation. (Rec. Doc. 5 at 24.) McKinley alleges that, after the transfer, Laskie began issuing her counseling and discipline for alleged performance issues and failures to follow his directives. (Rec. Doc. 5 at 27.)

The relationship between McKinley and Laskie continued to deteriorate in 2023. In March, Mount Olivet began preparing for "Phase 8," an expansion project involving additional burial crypts. (Rec. Doc. 5 at 28.) McKinley requested a seminar to promote the expansion. (Id.) Laskie initially offered her either self-invite seminars in April or a company-sponsored mail-out seminar in May. McKinley selected the latter option and began preparing for the seminar. (Id.) On April 24, however, Laskie informed her that the company-sponsored mail-out would be for the PPA team and that McKinley's team could instead conduct a self-invite seminar. (Rec. Doc. 5 at 29.)

McKinley complained to SCI management the following day. She expressed concern that allowing PPAs to participate in the company-sponsored mail-out would permit them to receive leads and commissions generated from customers in Mount Olivet's predominantly African American and Creole market. (Rec. Doc. 5 at 31.) She further alleged that her team was being denied access to higher-value sales opportunities while the predominantly white PPA team was not subject to the same restrictions. (Rec. Doc. 5 at 32.)

In May 2023, McKinley alleges that Laskie directed SCI Human Resources to alter her compensation plan after learning of her earnings, resulting in a reduction in her overall compensation. (Rec. Doc. 5 at 38.) Laskie also increased McKinley's monthly sales quota from $310,000 to $370,000, making it more difficult for her to meet the quota. (Rec. Doc. 5 at 40.)

McKinley alleges that no other Sales Manager, all of whom she states were white during her tenure, had their compensation plan reduced. (Rec. Doc. 5 at 41.)

McKinley received another written warning on August 25, 2023, after Laskie directed another manager to discipline her for contacting a person on the same day that another sales associate had contacted that person. (Rec. Doc. 5 at 41.)

McKinley was terminated on November 17, 2023. According to McKinley, the stated basis for her termination was her removal from Workday of a sales associate who had resigned approximately one week earlier. (Rec. Doc. 5 at 42.) Laskie had wanted to delay accepting the resignation while he explored whether another position could be offered to the employee. (Rec. Doc. 5 at 42.) McKinley alleges that the Human Resources Manager had authorized her to remove the employee from Workday and that she acted pursuant to that authority. (Rec. Doc. 5 at 42–43.) She contends that Laskie nevertheless used the incident as a pretext for terminating her because she had previously reported his conduct and engaged in other protected activity. (Rec. Doc. 5 at 44.)

## II. PROCEDURAL HISTORY

McKinley initially asserted several claims against SCI. On June 6, 2024, McKinley filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") and the Louisiana Commission on Human Rights. (Rec. Doc. 15-2.) In her Charge, McKinley alleged that: (1) in June 2023, SCI changed her compensation plan; (2) in June 2023, Laskie informed her that mail-out leads would be given to a different sales team composed only of white associates; and (3) in November 2023, she was suspended and subsequently discharged. (Id.) McKinley stated that she believed she had been discriminated against because of her race.

(Id.) On January 7, 2025, the EEOC issued McKinley a Notice of Right to Sue concerning the allegations contained in her Charge. (Rec. Doc. 5 at 73.)

On April 7, 2025, McKinley filed this action against SCI and subsequently amended her complaint to assert several claims not included in her EEOC Charge. (Rec. Docs. 1, 5.) In her Amended Complaint, McKinley asserted claims against SCI for: (1) hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981; (2) disparate treatment in violation of Title VII and 42 U.S.C. § 1981; (3) disparate impact in violation of Title VII and 42 U.S.C. § 1981; and (4) retaliation in violation of Title VII and 42 U.S.C. § 1981. (Rec. Doc. 5 at 46–71.)

On August 20, 2025, SCI filed a motion to dismiss all claims asserted by McKinley under Federal Rule of Civil Procedure 12(b)(6). (Rec. Doc. 15.) On March 27, 2026, the Court granted in part and denied in part SCI's motion. Specifically, the Court dismissed McKinley's hostile-work-environment claims under Title VII and § 1981; dismissed with prejudice McKinley's disparate-impact claims under § 1981; dismissed with prejudice McKinley's retaliation claims under Title VII and § 1981; and dismissed with prejudice McKinley's disparate-treatment claims under Title VII. The Court denied SCI's motion as to McKinley's disparate-treatment claim under § 1981. The Court instructed McKinley to address the deficiencies in the claims dismissed without prejudice and warned that failure to do so would result in dismissal with prejudice. McKinley has not filed anything addressing those deficiencies. (Rec. Doc. 47).

McKinley also has failed to participate in discovery. She has not provided initial disclosures or responded to SCI's discovery requests. SCI served its first set of interrogatories and requests for production of documents on June 10, 2026. (Rec. Doc. 46-3.) After receiving no responses or communication from McKinley's counsel, SCI requested a discovery conference,

which was scheduled for July 20, 2026, to determine a date by which responses could be expected. Counsel for SCI appeared for the conference at the appointed date and time, but counsel for McKinley did not participate. (Rec. Doc. 46-1 at 2.) SCI then filed a Motion to Compel on July 21, 2026. (Rec. Doc. 46.) McKinley did not file an opposition.

On August 5, 2026, Magistrate Judge Karen Wells Roby issued an Order compelling McKinley to provide responses to all outstanding discovery no later than August 19, 2026. (Rec. Doc. 47.) As of August 20, 2026, McKinley has not responded to discovery despite Judge Roby's Order. (Rec. Doc. 51-1 at 2.) On August 12, 2026, SCI filed its Motion for Summary Judgment, which is presently before the Court. On August 20, 2026, SCI filed its Motion to Dismiss for Failure to Prosecute. (Rec. Doc. 51.) A five-day jury trial is scheduled to begin on October 26, 2026. (Rec. Doc. 28.)

## III. LAW & ANALYSIS

### *A. SCI's Motion to Dismiss for Failure to Prosecute*

In the alternative to its Motion for Summary Judgment, SCI moves to dismiss Plaintiff's claims for failure to prosecute. Federal Rule of Civil Procedure 41(b) provides that "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). Unless otherwise specified, dismissal under Rule 41(b) operates as an adjudication on the merits. Fed. R. Civ. P. 41(b).

The Fifth Circuit requires "a clear record of delay or contumacious conduct by the plaintiff," together with an express finding that "no lesser sanction would suffice to prompt diligent prosecution," before dismissal under Rule 41(b) is appropriate. *See Meyers v. Jefferson Parish Sheriff's Office*, No. CV 19-5094, 2021 WL 1894862, at *2 (E.D. La. May 11, 2021) (*citing Raborn v. Inpatient Mgmt. Partners Inc.*, 278 F. App'x 402, 404 (5th Cir. 2008)). A clear record of delay

exists where there have been "significant periods of total inactivity." *Id.* (quoting *Berry v. CIGNA/RSI CIGNA*, 975 F.2d 1188, 1191 n.5 (5th Cir. 1992)). Once a clear record of delay is established, at least one of the following "aggravated factors" will ordinarily also be present: "(1) the delay was caused by the plaintiff, as opposed to his attorney; (2) the defendant suffered actual prejudice; or (3) the delay was caused by intentional conduct." *Id.* Additionally, Federal Rule of Civil Procedure 37(b)(2)(A) authorizes a court to impose sanctions when a party "fails to obey an order to provide or permit discovery." Available sanctions include dismissal of the action. Fed. R. Civ. P. 37(b)(2)(A).

As SCI explains in its motion, Plaintiff appears to have ceased participating meaningfully in the litigation since October 29, 2025. Plaintiff has failed to participate in initial disclosures, discovery, or discovery conferences; failed to submit witness lists, exhibit lists, and expert disclosures as required by the Scheduling Order; and failed to comply with the Court's August 5, 2026, Order directing her to respond to outstanding discovery. (Rec. Doc. 51-1 at 3.) The Court's August 5, 2026, Order afforded Plaintiff fourteen (14) days to respond to the outstanding discovery. The Court further noted that Plaintiff's counsel had failed to respond to discovery pursuant to Rules 33 and 34 and had failed to participate in a Rule 37.1 conference. This shows that Plaintiff is engaging in the conduct described by Rule 41(b), warranting the Defendant to move for dismissal. Fed. R. Civ. P. 41(b).

Plaintiff has also failed to respond to SCI's pending motions. Plaintiff's response to SCI's Motion for Summary Judgment and Motion to Compel was due on July 28, 2026, pursuant to Local Rule 7.2, but no response was filed. As of August 25, 2026, Plaintiff has not responded to the Motion for Summary Judgment, has not complied with the discovery obligations identified in SCI's Motion to Compel, and has not otherwise demonstrated meaningful participation in this

litigation. Furthermore, the case is rapidly approaching critical pretrial deadlines. Discovery closes on September 15, 2026, and trial is set for October 26, 2026. (Rec. Doc. 28.)

In *Meyers*, the court had issued a scheduling order providing that initial disclosures be exchanged within 14 days, the plaintiff failed to provide initial disclosures. *See Meyers,* No. CV 19-5094, 2021 WL 1894862, at *2. Additionally, the plaintiff failed to attend a status conference and when the defendant filed a motion to compel, the plaintiff failed to respond. *Id.* The plaintiff also did not file a witness or exhibit list pursuant to the court's scheduling order. *Id.* Accordingly, the court granted defendant's Motion for Involuntary Dismissal Pursuant to Rule 41 (b). *Id.*

Accordingly, McKinley's continued failure to participate in discovery or respond to pending motions materially impedes the parties' ability to prepare for trial and further demonstrates a clear record of delay and inactivity. *See Meyers,* No. CV 19-5094, 2021 WL 1894862, at *2. Plaintiff has failed to prosecute this action and has failed to comply with both the Federal Rules of Civil Procedure and the Court's August 5, 2026, Order. Accordingly, plaintiff's claims are subject to dismissal under Rules 41(b) and 37(b)(2)(A).

*B. SCI's Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Material in support or opposition of a motion for summary judgment may be considered if it is "capable of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original) (quoting Fed. R. Civ. P. 56(c)(2)). Courts view all facts and evidence in the light most favorable to the non-moving party, but "refrain from making

credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398 (5th Cir. 2008).

Where the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323. However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co*., 16 F.3d 616, 618 (5th Cir. 1994). Should the movant meet its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *Lindsey*, 16 F.3d at 618. Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Bargher v. White*, 928 F.3d 439, 444–45 (5th Cir. 2019). Additionally, conclusory allegations, denials, improbable inferences, unsubstantiated assertions, speculation, and legalistic argumentation do not adequately substitute for specific facts showing a genuine factual issue for trial. *See Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

In a discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against her because of her race. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993). A plaintiff may establish intentional discrimination through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Where a defendant moves for summary judgment on an employment discrimination claim based on circumstantial evidence, the Court utilizes the burden-shifting framework

established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Turner v. Kansas City Southern Ry. Co.,* 675 F.3d 887, 892 (5th Cir. 2012). The first step of the *McDonnell Douglas* analysis requires "[t]he plaintiff [to] establish a *prima facie* case that the defendant made an employment decision that was motivated by a protected factor." *Id. (quoting Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1089 (5th Cir.1995)). If the plaintiff establishes a *prima facie* case, the court proceeds to the next stage of the analysis, where "the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason." *Id.* If the defendant carries its burden, the analysis moves to the third *McDonnell Douglas* step, where "[t]he burden ... shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination." *Id.*

At the pretext stage, a plaintiff's subjective belief that discrimination motivated an employment decision, standing alone, is insufficient to defeat summary judgment. Conclusory allegations, speculation, and unsubstantiated assertions likewise cannot establish pretext. *Clark v. Sw. Bell Tel. Co.*, No. CA3:96-CV-2913-BC, 1998 WL 292366, at *3 (N.D. Tex. May 27, 1998); *Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 869 (5th Cir. 2010). Consistent with this principle, the Fifth Circuit has affirmed summary judgment where a plaintiff relies merely on her subjective belief that discrimination occurred to establish pretext. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999) (per curiam); *McVille v. Inter-Cmty. Healthcare, Inc.*, 460 F. App'x 353, 356 (5th Cir. 2012).

McKinley has not established a prima facie case of race discrimination under a disparate-treatment theory. She identifies eight alleged instances of disparate treatment: (1) exclusion from high-earning areas; (2) hostile remarks by managers, including remarks concerning her

compensation; (3) denial of promotional opportunities in favor of less-qualified white employees; (4) reassignment through a lateral transfer after engaging in protected EEO activity; (5) denial of access to at-need services and key sales events; (6) fabricated write-ups and disciplinary actions intended to undermine her credibility and secure her termination; (7) a company culture in which only non-African American employees were permitted to advance to management positions; and (8) retaliation for opposing discrimination. (Rec. Doc. 32 at 20–22.) As noted above, the first step of the *McDonnell Douglas* analysis requires "[t]he plaintiff [to] establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor." *Turner,* 675 F.3d at 892 (quoting *Mayberry v. Vought Aircraft Co*., 55 F.3d 1086, 1089 (5th Cir. 1995)). McKinley, however, has offered no evidence establishing that any of these alleged actions were motivated by her race. Indeed, the allegations in her Amended Complaint acknowledge that she was subject to a workplace policy that applied universally and that she was terminated for insubordination. Accordingly, McKinley has failed to establish a prima facie case of disparate treatment.

Even assuming McKinley could establish a prima facie case, SCI has satisfied the second step of the *McDonnell Douglas* framework by articulating legitimate, nondiscriminatory reasons for the challenged employment actions. *McDonnell*, 411 U.S. at 802. Specifically, each of the three disciplinary measures, including McKinley's termination, resulted from violations of company policy. (Rec. Doc. 48-1 at 5.) The September 26, 2022, incident that resulted in McKinley's first written warning arose from her failure to comply with the Lead Protection Policy and her subsequent inappropriate and unprofessional conduct. (Rec. Doc. 48-1 at 15.) Likewise, the August 25, 2023, incident that resulted in her second written warning arose from her failure to comply with the Lead Protection Policy. (Id.) Following that second warning, McKinley was

expressly informed that it constituted her final warning. (Id.) McKinley was ultimately terminated after she accepted an employee's resignation despite having been specifically instructed not to do so because doing so would make it more difficult to transfer the employee to another location. (Id.) SCI also has presented evidence that the workplace policy that allegedly excluded McKinley from high-earning areas and sales events was applied uniformly to employees regardless of race. (Id. at 8.) SCI also has shown that the compensation plan applied to McKinley was a nationwide compensation plan applied to all sales managers in New Orleans. (Id. at 9.) Thus, SCI has identified legitimate, nondiscriminatory reasons for the challenged disciplinary actions and McKinley's termination and has satisfied its burden under the second step of the McDonnell Douglas framework.

McKinley has failed to identify any evidence demonstrating that SCI's stated reasons were pretextual. Her conclusory allegations that the disciplinary actions were fabricated and motivated by racial animus are insufficient to create a genuine dispute of material fact, particularly where she has identified no evidence contradicting SCI's stated reasons or demonstrating that similarly situated employees outside her protected class were treated more favorably. McKinley has not responded to SCI's Motion for Summary Judgment or to SCI's discovery requests, despite SCI's Motion to Compel. Accordingly, she has not identified any evidence creating a genuine dispute of material fact as to whether SCI's stated reasons were false or whether its actions were instead motivated by racial discrimination. McKinley therefore has failed to carry her burden under the McDonnell Douglas framework.

For the reasons set forth above, SCI is entitled to judgment as a matter of law on McKinley's remaining disparate-treatment claim. McKinley has failed to produce sufficient evidence to establish a genuine dispute of material fact as to an essential element of her claim.

New Orleans, Louisiana, this 22nd day of September 2026

Senior United States District Judge